UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| KIMBERLY L.,<br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>KILOLO KIJAKAZI, Commissioner of<br>Social Security,[1]<br>　　　　　　*Defendant*. | Case No. 1:20-cv-00536-TSE-MSN |

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 15, 18). Plaintiff Kimberly L. ("plaintiff") seeks judicial review of the final decision of defendant Kilolo Kijakazi, Commissioner of the Social Security Administration, denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 15) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 18) be GRANTED, and the ALJ's decision be AFFIRMED.[2]

## I.　　Background

Plaintiff applied for disability insurance benefits on August 25, 2015. AR at 16. Plaintiff alleged permanent disability beginning May 1, 2015[3] from multiple sclerosis ("MS"), migraines,

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Dkt. No. 11). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

[3] Plaintiff originally claimed disability beginning March 26, 2013, but amended that onset date in a written motion at her hearing before the ALJ.

depression, vertigo, and restless leg syndrome. *Id.* at 16, 243.

Plaintiff's application was initially denied on January 11, 2016, and again upon reconsideration on October 24, 2016. *Id.* at 114, 126. A hearing was held on October 26, 2018, before Administrative Law Judge ("ALJ") Thomas Ray. *Id.* at 40. Plaintiff, represented by an attorney, testified at the hearing, as did a Vocational Expert ("VE"). *Id.* On February 26, 2019, the ALJ issued a decision finding that plaintiff was not disabled under the Act. *Id.* at 32. Plaintiff requested review of the decision by the Appeals Council, and the Appeals Council denied the request for review, finding no basis for review. *Id.* at 4.

Having exhausted her administrative remedies, plaintiff filed a Complaint with this Court on May 9, 2020, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 15) on November 10, 2020, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 16). The Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 18) on December 11, 2020, along with a Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 19). Accordingly, the parties' motions are ripe for disposition.

## II.   Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ, medical evidence of plaintiff's impairments, and state medical opinion evidence.

### A.   Plaintiff's Testimony at the Administrative Hearing

At the hearing on October 26, 2018, plaintiff, represented by an attorney, appeared before the ALJ. As an initial matter at the hearing, plaintiff amended her onset date, through a written motion, to May 1, 2015. AR at 49-50. Plaintiff testified that she was born in 1966 and has a high school education. *Id.* at 52. She lives with her husband who works outside the home as a contractor.

*Id.* at 57. They live in a three-story house and sleep on the upper level. *Id.* Plaintiff testified that she takes care of the dogs, attends appointments, and does household chores like laundry during the day. *Id.* at 58. She noted that she has a driver's license and no restrictions on driving. *Id.* She testified that she walks and stretches and does not use any assistive devices, such as a cane. *Id.* at 59.

She stopped working in 2015, but before that she worked as a home care physical therapist. *Id.* at 53. She stated that she stopped working because it was too taxing and she did not feel she could safely perform her job due to lack of balance. *Id.* As a physical therapy assistant, she had to help lift patients on a daily basis but was not required to lift other things on a frequent basis. *Id.* at 56, 68. She did, however, have to use a portable ultrasound machine and weights, which required carrying 10 to 15 lbs. *Id.* at 56.

Plaintiff described difficulty with her hands, including lack of dexterity, control, and fine motor skills. *Id.* at 60. She testified that she experiences pain after using her hands for some tasks, like lifting, but not for others, like when writing a card. *Id.* She described a sensation of pins and needles all over her body. *Id.* at 61.

She testified that, after a relapse of MS two years prior, she had started monthly IV transfusions. *Id.* at 55-56. She independently takes her medication, but experiences tiredness from some of them. *Id.* at 59-60. She noted that she did not want to take pain medication or muscle relaxants. *Id.* at 60.

Upon questioning by her attorney, plaintiff testified she could use a keyboard for 15 minute increments, but she would then need a 10 to 15 minute break due to tremors. *Id.* at 62. She described lying down for two to three hours out of eight hours approximately three days per week. *Id.* She stated that, other days, she takes three or four short breaks instead. *Id.* at 63. She stated that

she could do a simple job, sitting with support, but could not go two hours without taking a break and would need to stand. *Id.* She testified that she gets lost while driving, even while using a GPS. *Id.* at 64. She stated that she could not walk for 15 minutes without stopping or sit for more than 30 minutes. *Id.* at 66. She said her "cognitive" had gotten worse in the last couple of years and that she experiences double vision that gives her headaches. *Id.* She suffers from urinary incontinence but takes daily medication that helps control the problem. *Id.* at 67.  She also suffers from anemia. *Id.*

In testimony from the VE, it was established that plaintiff worked as a physical therapy assistant, which is categorized as medium, skilled work. *Id.* at 70. The ALJ posed the following hypothetical for the VE to consider. The hypothetical person has plaintiff's same vocational profile in terms of age, education, and work experience. The ALJ posed a situation where the individual can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, can stand and/or walk for a total of six hours in an eight-hour work day, can sit for a total of six hours in an eight-hour work day, can push and/or pull as much as she can lift and/or carry, but can only frequently use hand controls. *Id.* at 71. The hypothetical person can frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds. *Id.* There is no limitation on balancing, can frequently stoop, frequently kneel, frequently crouch, occasionally crawl. *Id.* They can frequently handle, finger, feel, and can have occasional exposure to heat, vibration and hazards such as moving mechanical parts and unprotected heights, and occasionally operate a motor vehicle. *Id.* at 71-72. The hypothetical individual would be limited to performing simple one-to-four-step routines, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, with occasional contact with coworkers, supervisors, and the public, and no fast pace or production quotas such as would be

customarily found working on an assembly line. *Id.* at 72.  The ALJ asked if, given this first set of limitations, plaintiff's prior work could be performed as generally performed in the national economy. *Id.* The VE replied that past work would be eliminated. *Id.* The ALJ asked if it could be performed as actually performed and the VE again replied in the negative. *Id.* However, given these limitations, the VE identified other available jobs in the national economy including light, unskilled jobs of sorter, clerical checker, and non-postal mail clerk. *Id.* at 72-73. The VE clarified that the sorter would require frequent hand use and the mail clerk would require frequent reaching, handling and fingering. *Id.* at 73.

The ALJ posed a second hypothetical with the same limitations except the hypothetical individual could only occasionally climb ramps or stairs and can never climb ladders, ropes, or scaffolds. *Id.* at 73-74. They also would need an occupation which would tolerate being off task 20 percent of the time. *Id.* at 74. The VE testified that there would be no unskilled work available for the second hypothetical individual. *Id.*

The ALJ posed a third hypothetical with the same limitations as the second, except he removed the hypothetical person's limitation of being off task 20 percent of the time. *Id.* However, this individual would need to be absent from work two days per month on an unscheduled basis. *Id.* The VE testified that there would not be any unskilled work available for the third hypothetical person. *Id.* The VE noted that the questions related to off-task and absenteeism are not addressed in the *DOT* but were based on his knowledge and experience as a vocational rehabilitation counselor. *Id.* at 75.

### B.    Medical Evidence of Alleged Impairments

The record contains evidence beginning in 2013, when plaintiff was diagnosed with MS, before plaintiff's alleged onset date. *Id.* at 1244.

The first evidence after plaintiff's alleged onset date is an MRI of her brain on March 19, 2015, which showed a stable pattern of multiple small scattered foci of abnormal T2 prolongation in the white matter of both cerebral hemispheres. *Id.* at 435. There was no abnormal enhancement. *Id.* The report notes there was no change compared to the previous year. *Id.* at 436. An MRI of plaintiff's thoracic spine the same day showed a stable pattern of signal abnormality in the parenchyma of the thoracic portion of the spinal cord at T9, T11, and T12. *Id.* at 437. There was no change from the prior year. *Id.* In addition, an MRI of plaintiff's lumbosacral spine showed small disc bulges at L4-L5 and L5-S1 with no central spinal canal stenosis and no discrete nerve root impingement. *Id.* On March 24, 2015, Dr. James Simsarian noted that the MRIs indicated small disc bulges, in the lumbar spine, but no evidence of nerve root compression to explain the pain. *Id.* at 1744. He recommended plaintiff wear a back brace while she works, because that was when she stated her pain was most severe. *Id.* There is no evidence she pursued this.

On May 26, 2015, plaintiff saw Dr. Simsarian at Neurology Center of Fairfax with MS symptoms of fatigue, bowel problems, upper and lower extremity weakness, and depression. *Id.* at 1450. She had no confusion, speech difficulties, or difficulty walking. *Id.* He administered an infusion of Tysabri, and she left in stable condition. *Id.* at 1452. She again sought treatment in June and July of 2015. *Id.* at 1448, 1426. She received steroid treatment from Dr. Simsarian in June and July of 2015 as well. *Id.* at 1430.

On July 7, 2015, plaintiff saw her primary care physician, Dr. Hakima Bouhouch. *Id.* at 552. She reported tension and cervical pain, but was negative for myalgia, joint pain, or swelling, and had no musculoskeletal abnormalities. *Id.* It was noted that she refused physical therapy due to lack of time. *Id.* at 553.

On August 4, 2015, at an appointment with nurse practitioner Meagan Adamson at

Neurology Center of Fairfax, she noted that she had turned down job opportunities and was concerned whether she could safely care for her clients. *Id.* at 950. She inquired as to whether she was a candidate for disability. *Id.* She reported no pain. *Id.* at 952. She complained of depression and denied feeling anxious. *Id.* She reported difficulty finding words and reported challenges with her attention and concentration. *Id.* A physical examination was unremarkable showing mild tenderness of the cervical, trapezius, chest wall, and lower back. *Id.* at 953. She had symmetrical reflexes, intact coordination, and ability to tandem, toe, and heel walk. *Id.* Nurse Adamson noted that plaintiff's coordination improved and wanted her to participate in physical therapy and a cognitive test prior to attempting further intervention and before determining her eligibility for disability. *Id.* at 955.

On August 20, 2015, plaintiff underwent cognitive testing, which revealed that she performed below expectations in simple attention span, language skills, information processing, and mood inventory. *Id.* at 945. Her verbal learning, delayed memory recall, and executive function/mental flexibility were within normal limits. *Id.* She scored a 30/30 on the mini-mental status examination, which was within normal limits. *Id.* at 945-946. Plaintiff's mood inventory results were suggestive of moderate depression and it was recommended that she pursue mental health services and further neuropsychological testing. *Id.* at 946. There is no evidence she pursued treatment.

On August 24, 2015, she returned to Dr. Simsarian for a Tysabri infusion. *Id.* at 1417. She reported fatigue, memory lapse, arm and hand weakness, leg and foot weakness, poor coordination, and numbness of the arm and hands. *Id.* at 1418. She received another infusion on September 21, 2015. *Id.* at 1413.

On September 28, 2015, at an appointment with Dr. Bouhouch, plaintiff complained of

depression, weakness, vision problems, and fatigue. *Id.* at 599. Dr. Bouhouch reported that she was tearful and her mood was flat, but her behavior and thought content were normal. *Id.* at 600. She was oriented to person, place, time and date. *Id.* She had cognition grossly intact with insight and judgment that were good. *Id.* Plaintiff's extremities were normal, with no tenderness in her back, and intact cranial nerves. *Id.* She had no cerebellar deficits, and normal deep tendon reflexes. *Id.*

Plaintiff attended physical therapy on October 6, 2015, noting increased weakness and balance difficulties. *Id.* at 317. It was recommended that she attend rehabilitative therapy for two visits per week with an expected duration of one month. *Id.* at 319. Plaintiff returned on October 12 and 13, 2015, where it is noted she had no complaints of pain or difficulty with treatment and therapeutic activity. *Id.* at 312-16. She again attended physical therapy on October 16, 20 and 27, 2015. *Id.* at 327, 330, 333. She returned to physical therapy on November 5 and 6, 2015. *Id.* at 320, 324. She had decreased right lumbar paraspinal area tightness. *Id.* at 325. She was unable to perform a single leg calf raise, but she had no flexibility deficits. *Id.* at 321.

Plaintiff saw Dr. Simsarian on October 9, 2015 for reevaluation of her MS. *Id.* at 1406. She reported daily pressure headaches with sensitivity to light. *Id.* She had no new motor impairment but difficulty with general strength and cognitive processing. *Id.* She reported vision strain and was going to see her neuro-ophthalmologist. *Id.* She returned on October 14, 2015 and was administered magnesium sulfate for a migraine. *Id.* at 1402.

MRIs of the brain and cervical spine in September and October 2015 showed no cervical spinal cord lesion, and stable appearing, nonenhancing T9 and T11 level thoracic spinal cord lesions. *Id.* at 1135-36. There were several small nonenhancing hyperintense flair foci that appeared stable. *Id.* at 1136. The overall impression was a stable exam. *Id.*

On November 11, 2015, plaintiff saw Nurse Adamson and reported fatigue, back and neck pain, numbness, and depression. *Id.* at 893. Upon examination, she had mild tenderness of the cervical, trapezius, chest wall, and lower back. *Id.* at 895. Her extremity strength and gait were normal. *Id.* It is noted that her primary care physician started her on Adderall which helped her attention and focus. *Id.* at 898. She refused to see a psychiatrist. *Id.*

On November 18, 2015, at an appointment with Dr. Simsarian, plaintiff complained of fatigue, worsening vision, memory loss or lapses, weakness, and numbness in her extremities. *Id.* at 336. She received a Tysabri infusion and was sent home in stable condition. *Id.* at 338.

On November 19, 2015, plaintiff saw Dr. Brian Egan for complaints of blurred vision due to possible optic neuritis in her left eye. *Id.* at 1282. She was found to have corrected visual acuity of 20/25 in each eye, and her eyes were found to be physically normal with full 24-2 visual field in each eye. *Id*. The doctor concluded there was no evidence of optic nerve dysfunction. *Id.*

On examination by Dr. Tushar Patel at Inova Family practice on November 23, 2015, her extremities had a normal range of motion, normal reflexes, normal coordination, no edema or tenderness, and no cranial nerve deficit. *Id.* at 633. She was oriented to person, place, and time. *Id.* Her judgment, cognition, and memory were normal, and she did not exhibit a depressed mood. *Id.*

On December 16, 2015, she received another Tysabri infusion from Dr. Simsarian. *Id.* at 1394. She reported fatigue, arm weakness, hand weakness, leg and foot weakness, and some numbness of the arms, hands, and legs. *Id.* at 1395. She had another infusion on January 12, 2016. *Id.* at 1390.

On February 13, 2016, plaintiff reported to Nurse Adamson that her headaches were stable and that she did not intend to see a psychiatrist, despite the recommendation to do so. *Id.* at 660. She reported unchanged extremity weakness and had mild tenderness of the cervical and trapezius

area, some pain upon palpation of the left lumbosacral area, mildly decreased sensation to vibration in her feet, and pinprick sensation changes at the upper thighs and upper arms. *Id.* at 663. Her motor exam was normal, her upper and lower extremity strength was 5-/5. *Id.* She had symmetrical reflexes and could tandem, toe and heel walk. *Id.* Plaintiff's MS was noted to be stable, but neuropsychological testing and further physical therapy was recommended. *Id.* at 665.

On May 10, 2016, plaintiff saw Nurse Adamson. *Id.* at 855. She reported depression and that she was seeing a therapist. *Id.* She noted an episode when she was driving and experienced a few seconds of confusion. *Id.* It was noted that she did not complete physical therapy "as ordered." *Id.* Her migraine condition remained stable. *Id.* at 856. Her physical examination remained unchanged. *Id.* at 858. Nurse Adamson recommended she return to physical therapy but plaintiff was "adamantly declining to return." *Id.* at 863.

On June 27, 2016, plaintiff saw Nurse Adamson and reported difficulties with attention and concentration and reported that her dosage of Adderall was no longer effective. *Id.* at 840. She reported her sleep medication was not working and that she averaged three hours of sleep per night. *Id.* at 841. Her examination was unchanged, and Nurse Adamson noted her MS was clinically stable. *Id.* at 847. She had pain with straight leg raises and slightly more numbness in the left leg. *Id.* Her dosage of Adderall was increased, and it was recommended that she get further laboratory testing. *Id.*

In June 2016, plaintiff had a neuropsychological evaluation with Christina VanVeelen, Ph.D. at Dominion Center for Behavior Health Services. *Id.* at 717. Plaintiff reported to Dr. VanVeelen that she had never been diagnosed with a learning disability, attention deficit disorder, or behavioral problem and never required an accommodation in the academic environment. *Id.* at 718. She reported that she earned an associate's degree in physical therapy and worked in the field

for 28 years until she decided to discontinue working due to her MS diagnosis, leg, and memory issues. *Id.* at 719. She reported difficulties with concentration, but her memory was generally intact with momentary lapses. *Id.* at 720. Plaintiff arrived on time and unaccompanied. *Id.* at 722. She was observed to be well dressed and groomed, walked normally without assistance, and had a normal gait. *Id.* She interacted in a socially appropriate manner, followed instruction without difficulty, had normal speech, no difficulty finding words, and good auditory comprehension. *Id.* Her mood was euthymic and her affect was constricted. *Id.* She had some frustration and anxiety related to her performance with the tasks. *Id.* She had logical and goal-directed thought processes. *Id.*

With regard to her general mental status test, she scored a 29/30, which is in the average range. *Id.* In intellectual function, she scored in the low average range. *Id.* On the General Abilities Index, she scored a 91, which was in the average range. *Id.* at 722-23. Her working memory was in the low average range, but her other attention and concentration tasks were in the average range. *Id.* She was mildly impaired on a task that required alternating between sequencing letters and numbers, suggesting significant difficulty with cognitive switching. *Id.* She was in the superior range for logical memory and in the high average range after a 30-minute delay. *Id.* Her other memory tests were generally average, but low-average with regard to visual memory. *Id.* at 724. On a test of mental flexibility and shifting demands, she had intact performance overall. *Id.* She scored average in phonemic fluency, low average in semantic fluency, and she was mildly impaired in speed naming and severely impaired in speed reading. *Id.* at 724-26. The doctor found a moderate likelihood of a disorder characterized by attention deficits. *Id.* at 725. She had some problems with visual perception and significant difficulty with visual organization. *Id.* at 726. Her motor speed was mildly impaired, her fine motor speed and dexterity were profoundly impaired,

her grip strength was moderately impaired in her dominant hand and mildly impaired in her non-dominant hand. *Id.* She had reduced graphomotor speed. *Id.* Based on self report, the doctor found a high likelihood that plaintiff was experiencing a depressive disorder. *Id.* at 726-27.

She was diagnosed with a mild neurocognitive disorder due to MS, depressive disorder, and anxiety disorder. *Id.* at 728. Dr. VanVeelen described her as able to perform general activities of daily living with greater effort or with the addition of compensatory strategies. *Id.* Dr. VanVeelen opined that plaintiff would have difficulties in the workplace due to her mild neurocognitive disorder as well as physical issues associated with MS, including impaired fine motor dexterity, impaired grip strength, and significant fatigue. *Id.* at 729. Dr. VanVeelen suggested that plaintiff not return to the work environment. *Id.* Dr. VanVeelen also noted that plaintiff should choose to work on one project at a time to minimize distractions. *Id.* at 730. She recommended a checklist, notebook, and calendar. *Id.* It was recommended that she be involved with social endeavors. *Id.* at 731.

A June 2016 MRI showed occasional small nonenhancing white matter lesions. *Id.* at 707. There was no abnormal enhancement. *Id.* There were no new lesions, no masses, no abnormal fluid collection, no mass effect or midline shift. *Id.* The overall impression was a stable appearance. *Id.* An MRI of the cervical spine showed stable degenerative changes, but normal cord signal and no abnormal enhancement. *Id.* at 709.

A July 2016 MRI of the lumbar spine showed minor degenerative changes most prominent at L4-L5 level, minimally worsened compared to prior examination. *Id.* at 762. An MRI of the thoracic spine revealed no definite new or enhancing lesions, and stable small focus of T2 prolongation in the cord at the level of the T11-T12 disc. *Id*. at 766.

In July 2016, plaintiff saw Dr. Simsarian and was treated with Tysabri. *Id.* at 754. She

reported fatigue, extremity weakness, numbness of the legs and pain in her right leg. *Id.* at 752.

On August 10, 2016, plaintiff saw Dr. Bouhouch complaining of back pain. *Id.* at 1824. Her lower extremities had no edema, and there were no signs of musculoskeletal abnormality. *Id.*

On August 11, 2016, Plaintiff participated in a diagnostic polysomnography study at Sleep Diagnostic and Treatment Center for insomnia, restless leg syndrome, nightmares, morning headaches, and daytime sleepiness. *Id.* at 819. The sleep study demonstrated sleep without evidence of sleep-disordered breathing, parasomnia, nocturnal epileptiform activity, bruxism, or cardiac arrhythmia. *Id.* at 820. She had periodic limb movements while sleeping. *Id.* On September 28, 2016, plaintiff saw Dr. Richard Cho for a sleep-medicine consultation. *Id.* at 792. Dr. Cho found her to be in no acute distress, with no disorientation or impaired memory, normal speech, normal muscle tone and strength, no muscular atrophy, no motor neglect, normal coordination, normal gait, and normal reflexes. *Id.* at 795. She had decreased response to pain, temperature, and vibration stimulation. *Id.* He diagnosed her with hypersomnia. *Id.* at 796

On August 26, 2016, plaintiff saw Nurse Adamson and complained of difficulty sleeping, depression, and difficulty with attention and concentration. *Id.* at 801-02. She reported chronic neck and lower back pain, but she declined physical therapy. *Id.* at 802. Nurse Adamson noted plaintiff's neck had mild tenderness at the cervical, trapezius, and chest wall areas, but had full cervical motion. *Id.* at 804. There was pain upon palpation of the lumbosacral area bilaterally. *Id.* She had normal motor strength and full extremity strength. *Id.* Her reflexes were symmetrical in the upper and lower extremities. *Id.* She had pin changes at the upper left leg, right knee, upper arms. *Id.* Sensation to vibration was mildly decreased in her feet. *Id.* Her finger to nose testing was intact and she could tandem, toe, and heel walk. *Id.* That same day she received a Tysabri infusion from Dr. Simsarian. *Id.* at 1377.

On August 30, 2016, Nurse Adamson wrote a letter to the Social Security Administration on behalf of the plaintiff. *Id.* at 779. She noted her treatment of plaintiff for extremity weakness, balance difficulties, impaired grip strength, fatigue, and impaired fine motor movements. *Id.* She noted plaintiff's low back pain, restless leg syndrome, and migraines. *Id.* She cited the neuropsychological study by Dr. VanVeelen which found plaintiff unable to work. *Id.* She stated that her physical impairments impaired her ability to work and would cause difficulty in her ability to perform her job effectively and without undue stress. *Id.*

In September 2016, plaintiff saw Katherine Riley, PA, at the National Spine Pain Centers, for right lower back pain. *Id.* at 1316. Plaintiff had increased hypertonicity of the lumbar paraspinal muscles and taut bands. *Id.* at 1318. She had restricted side bending and flexion. *Id.* She had no deformity or scoliosis, normal posture and gait, and normal mood, affect, attention span, and concentration. *Id.* at 1319. It was suspected that her pain was secondary to SI joint dysfunction myofascial pain and perhaps facet arthritis. *Id.* It was recommended that she attend physical therapy, but she wanted to try home exercise first. *Id.* at 1320.

On September 22, 2016, plaintiff received a Tysabri infusion from Dr. Simsarian. *Id.* at 1373. Plaintiff saw Dr. Cho on September 28, 2016 and had decreased response to pain, temperature stimulation, and vibration stimulation. *Id.* at 799. She had unimpaired memory, normal nerves, speech, motor function, and normal gait and normal deep tendon reflexes. *Id.* at 799.

Plaintiff followed up October 4, 2016 at the National Spine Pain Centers with Dr. Virgil Balint. 1185. Dr. Balint's findings upon examination were the same as plaintiff's previous visit. *Id.* at 1187. He performed an OMT corkscrew manipulation to improve the alignment of her SI joints. *Id.* at 1188. Dr. Balint similarly recommended physical therapy, but plaintiff declined. *Id.*

Plaintiff returned for trigger point injections in her right lumbar spine, neck, and SI area on October 13, 2016. *Id.* at 1312. On October 28, 2016, plaintiff returned and reported the trigger point injections aggravated her cervical pain. *Id.* at 1306. She stated she did not want any oral medication and requested a topical pain medication. *Id.* She was again found to be in no acute distress with normal posture, gait, mood, affect, attention span, and concentration. *Id.* at 1307. She had taut bands of the trapezius and the C56 and C67 facet joints, she had pain with extension and rotation. *Id.* at 1308. She had continued hypertonicity of the lumbar paraspinals, taut bands of the lower paraspinals, palpatory tenderness along the facet joint, SI joint tenderness, restricted side bending and restricted flexion. *Id.* She received more trigger point injections in the lumbar and gluteal regions instead and was prescribed a topical pain solution for cervical pain. *Id.* She was advised to return for trigger point injections. *Id.*

An October 2016 brain MRI showed no acute or significant intracranial pathology and no pathologic enhancement as evidence of active demyelination or inflammation, but "very mild" interval progression of a few subtle nonspecific T2 hyper-intense foci. *Id.* at 1264.

In November 2016, plaintiff complained to Dr. Bouhouch of neck pain, vertigo, mild headache, and mild upper back pain. *Id.* at 1882. She noted her MS had been affecting her cognitive function and she had difficulty concentrating that day for ten minutes. *Id.* A CT of the cervical spine showed straightening of the cervical lordosis, which could be due to spasm or radiographic positioning. *Id.* There was no fracture or dislocation, no structural lesions. *Id.* A head CT had no significant change from the prior exam. *Id.* Neck imaging showed no hemodynamically significant stenosis with the cervical carotid or vertebral arteries and no arterial dissection. *Id.* Her extremities had no pedal edema, clubbing or cyanosis. *Id.* at 1885. Her peripheral pulses were normal, strength was symmetric, she had good rapid alternating fine finger movements, sensation was intact, and

her gait was normal. *Id.* Her attention, short-term recall, fluency, and comprehension were normal. *Id.* She was alert and oriented to time, place, and person. *Id.*

In December 2016, she received another Tysabri infusion. *Id.* at 1369. She returned on January 12, 2017 reporting fatigue, right arm weakness, confusion, foot weakness, decreased concentration, numbness in the feet and hands, intermittent neuralgia with pain lasting a few hours to days. *Id. at 1365.* She received a Tysabri infusion and was in stable condition. *Id.* at 1367-68. She received further infusions on February 9 (*id.* at 1361), March 9 (*id.* at 1357), and April 20, 2017 (*id.* at 1353).

On April 16, 2017, a brain MRI documented no significant change, no new lesions, and no abnormal enhancement. *Id.* at 1573. A cervical MRI the same day showed stable thoracic cord lesions with no lesions identified in the cervical spinal cord and no new or enhancing lesions. *Id.* at 1574.

In May 2017, Dr. Simsarian completed a check-the-box medical source statement indicating that Plaintiff's ability to understand and carry out simple, one or two-step instructions was significantly limited. *Id.* at 1968. Dr. Simsarian further opined that Plaintiff's ability to maintain attention and concentration for extended periods, handle ordinary work stress or a high stress work environment, and complete a normal workday at a consistent pace was markedly limited. *Id.* at 1968-69. Dr. Simsarian also stated that Plaintiff's abilities to grasp and perform fine manipulation were limited due to impaired dexterity and coordination problems, she could never lift more than five pounds, and she could rarely squat, but never perform any other postural maneuvers. *Id.* at 1969-70. Dr. Simsarian concluded that Plaintiff could not work an eight-hour day. *Id.* at 1969.

On June 15, 2017, plaintiff saw Dr. Simsarian where she reported that she has been unable

16

to work due to fatigue, cognitive difficulty discoordination, and motor impairment. *Id.* at 2227. Her MS symptom sheet was positive in all areas except vision loss. *Id.* at 2228. She had mild tenderness of cervical and trapezius muscles, full cervical motion, and equal carotid pulses. *Id.* She had upper extremity strength of 5-/5, lower extremity strength right proximal of 4+/5 and distal 5-/5, left proximal and distal 5-/5. *Id.* Her reflexes were symmetrical, she had normal sensation, and could tandem, toe, and heel walk. *Id.* at 2231. They discussed a potential new medication. *Id.* at 2233.

In July 2017, plaintiff's primary care physician, Dr. Bouhouch filled out a check-the-box questionnaire and reported plaintiff could sit for less than three hours or stand for less than two hours in an eight-hour work day. *Id.* at 1972. She stated plaintiff needed to alternate between sitting and standing, could not use her hands for fine manipulation, but could use them for simple grasping and pushing and pulling. *Id.* Dr. Bouhouch said she could do repetitive motions for a short time only. *Id.* Dr. Bouhouch further stated she could rarely lift up to nine pounds, never lift more, and could never perform postural movements. *Id.* at 1972-73. Dr. Bouhouch recommended a total work restriction involving unprotect heights, a severe restriction involving moving machinery, and a moderate restriction involving temperature extremes, humidity and driving automotive equipment. *Id.* at 1973. The doctor noted her marked limitations in attention and concentration and found that she could not do even simple, unskilled work tasks. *Id.* Dr. Bouhouch noted "questions are better answered by neurology." *Id.*

On August 2, 2017, plaintiff saw Nurse Adamson, who reported plaintiff's MS was clinically stable, but there was disability progression. *Id.* at 2222. She discussed switching from Tysabri to Ocrevus. *Id.*

On October 2, 2017, plaintiff saw Dr. Bouhouch complaining of depression, anxiety, and

continuing sinus problems. *Id.* at 2130. Her back was not tender to palpation. *Id.* at 2133. On November 2, 2017, she again saw Dr. Bouhouch, complaining of left calf pain. *Id.* at 2090. She had mild swelling and tenderness to palpation on the left calf. *Id.* at 2107. She was negative for anxiety and depression. *Id.*

Plaintiff saw Nurse Adamson on November 9, 2017 and reported that she was having an increase in headaches, but that her medication was relieving them. *Id.* at 2203. She also noted a development of numbness and tingling in the hands 4-5 times per week. *Id.* She had a full range of neck motion, symmetrical reflexes, normal sensation, and could tandem, toe, and heel walk. *Id.* at 2207. She had upper extremity strength of 5-/5 and lower strength of 5-/5 except 4+/5 on the right proximally. *Id.* Nurse Adamson noted her MS was clinically stable. *Id.* at 2210.

Plaintiff saw Dr. Cho on November 13, 2017 and reported mild daytime sleepiness. *Id.* at 2198. Vyvanse had been effective in controlling her daytime sleepiness and Soma and Clonazepam had controlled her restless leg syndrome. *Id.* Her physical examination was unchanged, and she was found to be stable from a sleep disorder standpoint. *Id.* at 2202. She had unimpaired memory, normal muscle tone and strength, normal gait, and normal deep tendon reflexes. *Id.* at 2201.

MRI of the cervical spine on December 6, 2017 showed no evidence of demyelinating disease, disc disease at C5-C6 with moderate central stenosis and mild to moderate central stenosis at C6-C7. *Id.* at 2196. MRI of the brain showed stable mildly extensive small nonspecific supratentorial white matter T2 hyperintensities. *Id.* at 2197.

On January 11, 2018, at an appointment with Nurse Adamson, plaintiff reported she slept well with a chiropractic therapy pillow and that her migraines were stable. *Id.* at 2198. She reported taking meclizine for vertigo. *Id.* She described having carpal tunnel syndrome and numbness in her hands that was worsening. *Id.* at 2190. Plaintiff's upper extremity strength was 5-/5, lower

strength 5-/5 except for 4+/5 on the right proximally. *Id.* at 2193. Her reflexes, coordination, and gait were all normal. *Id.* She had slight changes to pinprick sensation at the mid-calf bilaterally and both wrists, but had normal sensation to position, vibration, and touch. *Id.*

On April 6, 2018, plaintiff saw Nurse Adamson, who noted that she had delayed her Tysabri treatment because plaintiff believed it was causing migraines. *Id.* at 2173. Her physical examination was unchanged. *Id.* at 2177.

In April 2018, Dr. Bouhouch found plaintiff to have no back tenderness, normal upper and lower extremities, no cyanosis, no cerebellar deficits, and normal memory. *Id.* at 2069. She reported dizziness, tingling, anxiety, and depression. *Id.* She had normal deep tendon reflexes, normal affect, and was oriented. *Id.* He noted that she had a euthymic mood, normal behavior, normal thought content, grossly intact cognition, and good insight. *Id.* Dr. Bouhouch noted that Plaintiff's depression and anxiety was stable on her current medication. *Id.* at 2066.

In May 2018, plaintiff saw Dr. Cho for her sleep disorder reporting her daytime sleepiness, ADD, and restless leg syndrome were all under control with medication. *Id.* at 2166. Her balance was impaired, and she had a decreased response to pain and temperature stimulation and vibration. *Id.* at 2169. She had normal gait and stance, no muscle atrophy and normal muscle tone. *Id.* She had no impairment of finger-to-nose movement. *Id.* She was alert and had normal thought processes. *Id.* She had no memory impairment and normal speech. *Id.*

An MRI on May 14, 2018 showed a stable pattern of intracranial demyelination of the brain, with no new or enhancing lesions. *Id.* at 2171. There were stable degenerative changes of the spine at C5-C6 and C6-C7, but no appreciable demyelinating disease within the cervical spinal cord. *Id.*

On July 31, 2018, plaintiff saw Nurse Adamson and reported no new neurologic symptoms,

mild balance difficulties, and stable migraines. *Id.* at 2153. Her MS was clinically stable, and her physical exam was unchanged. *Id.* at 2159-2160.

On August 30, 2018, plaintiff saw Dr. Bouhouch for gastrointestinal problems. *Id.* at 2039. Physical examination was normal. *Id.* at 2040-41. She had no pedal edema in her extremities, no clubbing, or cyanosis. *Id.* at 2044. On September 17, 2018, she saw him again to discuss a b12 shot. *Id.* at 2004. Physical examination was normal. *Id.* at 2019-20.

C.     **State Opinion Evidence**

On December 19, 2016, Dr. Robert McGuffin at the initial stage of review found that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, and she could stand or walk for a total of 6 hours and could sit for 6 hours of a workday. *Id.* at 84-85. He found that she could frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently stoop, kneel, and crouch; and occasionally crawl. *Id.* at 84-85. The doctor found mild cognitive impairment, but he gave her "some benefit of the doubt" and concluded her mental health concerns should be found to be severe. *Id.* at 82. However, a limitation to simple/unskilled work would sufficiently account for this limitation. *Id.* He found no significant limitation in her ability to carry out very short and simple instructions and only a moderate limitation in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. *Id.* at 86.

Dr. Paula Nuckols, at the reconsideration stage, independently reviewed the record and generally agreed with Dr. McGuffin's conclusions. *Id.* at 104-105. She limited plaintiff to only occasionally climbing ladders, ropes and scaffolds. *Id.* She noted that plaintiff's memory testing showed some impairment, but she considered it to be mild. *Id.* at 102. Plaintiff had some impairment in executive functioning and problems with organizational skills. *Id.* The doctor found plaintiff's statements only partially consistent with the objective evidence, noting some symptoms

appeared to be disproportionate. *Id.* at 103. Dr. Nuckols found plaintiff was not significantly limited in carrying out very short and simple instructions or detailed instructions. *Id.* at 106. She would be moderately limited in maintaining attention and concentration for an extended period of time. *Id.*

## II.     Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983).  Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [her] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### A.     The ALJ's Decision

On February 26, 2019, the ALJ issued a decision finding plaintiff not disabled from May

1, 2015, through the date of the decision and denying her application for benefits. AR at 32. Under the first step, the ALJ found that plaintiff did not engage in any substantial gainful activity from her alleged onset date of May 1, 20215. *Id.* at 19.

At step two, the ALJ found that plaintiff had the following severe impairments: multiple sclerosis, degenerative disc disease, organic mental disorders, depression, and anxiety. *Id.* The ALJ further found plaintiff's other medical conditions, alone or in combination, to be non-severe impairments. *Id.* He found plaintiff's migraines to be conservatively and effectively treated with medication. *Id.* at 19. He noted that plaintiff's vertigo was not demonstrated to cause functional limits, that her cranial nerves were intact, and her visual fields were full. *Id.* Her facial sensation and motor strength were normal, and her hearing was intact. *Id.* He addressed the evidence in the record of restless leg syndrome, but he found no indication of a vocationally relevant impact and no effect on gait. *Id.* Finally, he took note of evidence of asthma, but found it was intermittent, without complication, and treated conservatively with an inhaler. *Id.* at 10-20.

Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.* at 20. The ALJ considered listing 11.09 for multiple sclerosis, which requires disorganization of motor function in two extremities resulting in extreme limitation in standing up from a seated position, balancing or using upper extremities, or alternatively, requires marked limitation in physical functioning and a marked limitation in one of the paragraph B criteria. *Id.* The ALJ found no evidence of limitation in standing up, balancing, or use of upper extremities, and in fact found normal gait, motor strength, and tone. *Id.* The ALJ also considered listing 1.04, but did not find evidence of compromise of a nerve root or the spinal cord, and did not find evidence of spinal arachnoiditis or lumbar spinal stenosis. *Id.* Plaintiff had normal

gait and posture and negative straight-leg raise testing. *Id.* Finally, the ALJ considered listing 1.02, which requires major dysfunction of a joint and chronic joint pain with signs of limitation in motion or abnormal motion. *Id.* The ALJ noted plaintiff's degenerative disc disease and decreased range of motion but found her to have generally normal motor function and muscle tone. *Id.* at 21.

The ALJ also found plaintiff did not meet the paragraph B criteria. *Id.* He found that she only had mild limitations in understanding, remembering, or applying information. *Id.* Testing put her in the low average range with some difficulties in working memory, but he found her memory difficulties only "minimally problematic" with goal directed thought processes and normal thought content. *Id.* Plaintiff had only mild limitations in interacting with others. *Id.* She had only a mild limitation in concentration, persistence, and maintaining pace. Her attention span and concentration were normal, although she reported difficulties. *Id.* She had a moderate limitation in adapting or managing oneself, but her insight and judgment were good with no signs of impulsivity or mood swings. *Id*. The ALJ also found that plaintiff did not satisfy the "paragraph C" criteria. *Id.* at 22.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered all reported symptoms and the extent to which those were reasonably consistent with objective medical evidence and opinion evidence. *Id.* at 22. The ALJ applied a two-step process, considering first whether the underlying impairment would be reasonably expected to produce plaintiff's pain, and second whether the impairments limit plaintiff's functioning. *Id.* The ALJ determined that, while the impairments could be reasonably expected to cause plaintiff's symptoms, the plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 23.

The ALJ concluded that plaintiff had the RFC to perform light work except she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, could stand and/or walk for a total of six hours in an eight-hour work day, could sit for a total of six hours in an eight-hour work day, could push and/or pull as much as she can lift and/or carry, but could only frequently use hand controls, frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds, she has no limitation on balancing, can frequently stoop, kneel, crouch, could occasionally crawl, frequently handle, finger, and feel, and could only occasionally have exposure to extreme heat, vibration, and hazards such as moving mechanical parts and unprotected heights, she could occasionally operate a motor vehicle, and she is limited to performing simple one-to-four-step routines, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, with occasional contact with coworkers, supervisors, and the public, and no fast pace or production quotas such as would be customarily found working on an assembly line. *Id*. at 22.

The ALJ provided an overview of plaintiff's physical health treatment, followed by her mental health treatment, noting a history of MS and degenerative disk disease, but found that it did not have debilitating effects on plaintiff's functional abilities. *Id.* at 23. The ALJ found plaintiff's physical limitations consistent with a light exertional level with postural, manipulative, and environmental limitations. *Id.* at 29. He accounted for plaintiff's mood, memory, and intellectual functioning with a limitation to performing simple 1-4 step tasks in a low stress work environment. *Id.*

Regarding state medical opinion evidence, the ALJ noted that both doctors limited plaintiff to a light exertional level with postural and environmental limitations but found no more than moderate mental limits. *Id.* at 29. The ALJ found the record consistent with, at most, moderate

mental limits, but also found that her MS should require manipulative limits as well. *Id.* at 29. He therefore afforded the state agency doctors partial weight and fashioned an even more limiting RFC. *Id.*

The ALJ afforded partial weight to the opinion of Dr. VanVeelen, who opined that plaintiff would not be able to return to a work environment, would need checklists and reminders, and to work on one project at a time. *Id.* The ALJ agreed that the objective findings support that plaintiff functioned at a low-average intellectual level, and had limited cognitive flexibility, but she also scored 29/30 on a mini-mental status examination, which the ALJ found inconsistent with an inability to work. *Id.* He disagreed that plaintiff's cognitive limitations resulted in an inability to return to work entirely. *Id.*

The ALJ gave little weight to the opinion of Nurse Adamson, finding her opinion inconsistent with the objective findings of the record. *Id.* at 30. The ALJ summarized findings from Dr. Bouhouch of normal appearance, mood, speech, thought content, cognition, judgment and insight, which conflicted with Nurse Adamson's conclusion. *Id.* He noted evidence in the record of some physical limitations, but of normal gait, no musculoskeletal deformities, and no assistive devices. *Id.*

The ALJ afforded partial weight to the opinion of Dr. Simsarian. *Id.* The ALJ found that the record did not support Dr. Simsarian's finding of significant or marked mental limits but agreed with his finding of manipulative limits and accounted for it in his RFC determination. *Id.* He also gave little weight to the opinion of Dr. Bouhouch, who found plaintiff could sit or stand for less than two hours out of an eight-hour day and could never perform postural movements. *Id.* The ALJ found this in conflict with the evidence of plaintiff's normal gait, normal muscle tone and strength. *Id.* He found that there was a lack of psychiatric findings to support a marked limitation in attention

and concentration. *Id.*

Under step four, the ALJ found that plaintiff was not capable of performing her past relevant work as a physical therapy assistant. *Id.* at 30-31.

Under the final step, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. *Id.* at 31.

### B.    Appeals Council Review

The Appeals Council denied plaintiff's request for review, finding no basis for review, and held  the ALJ's decision to be the final decision of the Commissioner of Social Security. *Id.* at 4.

## III.    Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence in the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.*

(citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

## IV.    Analysis

Plaintiff's brief is unusual in form and lists various items of evidence that she believes were improperly considered, but plaintiff makes almost no legal argument tying the evidence to the ALJ's decision or the required elements needed to succeed on her appeal. *See* (Dkt. No. 16) at 6-9, "Statement of Undisputed Facts." In the interest of fully considering plaintiff's claims, the Court

construes plaintiff's list of evidentiary issues as a challenge to the ALJ's RFC determination, or explanation of that determination. Each item of evidence challenged is considered in turn. For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Motion for Summary Judgment, and affirming the ALJ's decision.

In determining an RFC, an ALJ is required to consider all "medically determinable impairments of which" they are aware, including "medically determinable impairments that are not 'severe.'" 20 CFR 404.1545(a)(2). The RFC is based on "all of the relevant medical and other evidence" 20 CFR 404.154(a)(3). The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints, objective medical evidence, and medical source opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011). Moreover, this Circuit has recognized that an ALJ is entitled to rely on the opinion of a reviewing physician or psychologist when it is consistent with the other evidence in the record. *See, e.g.*, *Johnson*, 434 F.3d at 656-57 (finding that substantial evidence "supports the ALJ's reliance on Dr. Starr's opinion" because his opinion was consistent with other doctors' opinions). It is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c).

This Court, in reviewing, may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589; *see also King*, 599 F.2d at 599 (providing that it is not the role of the court to try the case de novo when reviewing disability determinations). The "ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies, or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015).

A.      **Medical Impairments Incorrectly Assessed**

Plaintiff argues that the ALJ "incorrectly assessed" her medical impairments of insomnia, gait dysfunction, cognitive impairment and mental health, disc dysfunction, pain, MS, and migraines. (Dkt. No. 16) at 6-8.

i.      **Non-severe impairments**

As to plaintiff's non-severe insomnia/restless leg syndrome, gait dysfunction, cognitive impairment, pain, and migraines, the Court construes plaintiff's argument to be that the ALJ should have considered these to be severe impairments or otherwise considered them more thoroughly in the RFC determination. *Id.* The ALJ found that plaintiff's severe impairments included only multiple sclerosis, degenerative disc disease, organic mental disorders, depression, and anxiety. AR at 19.

As part of the sequential analysis, a plaintiff must prove that she has a "severe impairment . . . or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To establish a medical impairment, a plaintiff must provide medical evidence that her impairments limit her ability to perform "basic work activities." *Brown v. Yuckert*, 482 U.S. 137, 140-42, 146 n.5 (1987). Under the Act, a severe impairment must cause more than a minimal effect on the plaintiff's ability to function. *Id.* Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a plaintiff's] physical or mental ability to do basic work activities or last or be expected to last for a continuous period of at least 12 months." *Id.* at §§ 404.1509, 404.1521(a), 416.909, 416.921(a). The plaintiff has the burden of demonstrating that her impairment is severe. *See Bowen v. Yuckert*, 428 U.S. 137, 146 (1987). If the plaintiff "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§§ 404.1509

and § 416.909], or a combination of impairments that is severe and meets the duration requirement[,]" the ALJ must find that she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the ALJ found that plaintiff's non-severe impairments were minimal, he was not required to include them in plaintiff's RFC. *See Stricker v. Colvin*, Civ. No. 2:15-cv-15, 2015 WL 13239530, at *22 (N.D. W.Va. Oct. 30,2015) (holding that the ALJ is not required to discuss non-severe impairments at step four because they cause no more than a minimal limitation), report and recommendation adopted, 2016 WL 543216 (N.D. W. Va. Feb. 10, 2016); *Loveless v. Massanari*, 136 F. Supp. 2d 1245,1250-51 (M.D. Ala. 2001) ("[T]he hypothetical question posed by the ALJ [to the VE] may omit non-severe impairments.").

### 1.      Restless Leg Syndrome/Insomnia

Plaintiff argues that the ALJ incorrectly found no vocational impact from her restless leg syndrome. (Dkt. No. 16) at 6. Plaintiff claims her insomnia was worsened by the restless leg syndrome. *Id.* The ALJ acknowledged evidence in the record of restless leg syndrome but found no vocationally relevant impact. AR at 19.

The evidence in the record of plaintiff's restless leg syndrome is limited. In plaintiff's August 2016 sleep study, Dr. Cho noted "periodic limb movement while sleeping," but found no evidence of other sleep disturbances. *Id.* at 819-20. Upon seeing Dr. Cho again in November 2017, plaintiff reported her restless leg syndrome had been controlled with medication. *Id.* at 2198. She confirmed the restless leg syndrome was under control with medication in May 2018 as well. *Id.* at 2166. The ALJ cited Nurse Adamson's letter indicating plaintiff was being treated for restless leg syndrome at the Neurology Center of Fairfax, and she was pending further sleep testing and treatment. *Id.* at 779. While plaintiff cites records of visits to the Neurology Center of Fairfax

where fatigue is documented, and restless leg syndrome is listed under "active problems," none of these notes indicate a relationship between fatigue and the restless leg syndrome. *See e.g. id.* at 393, 800, 809, 2166 (cited by the plaintiff at (Dkt. No. 16) at 6). The only specific mention of plaintiff's restless leg syndrome in the Neurology Center of Fairfax notes indicates "[h]er RLS symptoms have been controlled." *Id.* at 2198, 2202.

Plaintiff, in her same paragraph of argument, acknowledges that her insomnia was caused by her MS, rather than restless leg syndrome. (Dkt. No. 16) at 6. The nurse's notes indicate that plaintiff's "sleeping difficulties and daytime fatigue are due in large part to multiple sclerosis," an impairment that the ALJ found severe and accounted for in the RFC determination. *Id.* at 800. In considering the severity and impact of plaintiff's MS, the ALJ accounted for "all symptoms," including insomnia that may result from MS. *Id.* at 22. Plaintiff did not allege disability due to insomnia, but rather alleged disability due to restless leg syndrome and MS. The ALJ, therefore, did not need to address insomnia as a separate source of disability. Even so, the record also makes clear that, following treatment with Dr. Cho, "from a sleep disorders standpoint, [she was] stable." *Id.* at 2202. There is no evidence in the record of limitations or vocational impact caused by restless leg syndrome or insomnia. The ALJ's consideration of insomnia and restless leg syndrome was therefore sufficient.

### 2.    Gait Dysfunction/Vertigo

Plaintiff argues that the ALJ incorrectly found plaintiff to have a normal gait and no issues with motor function. (Dkt. No. 16) at 6. Rather, plaintiff argues the ALJ should have considered her wide stance, gait dysfunction, and vertigo. *Id.*

The ALJ addressed plaintiff's vertigo at step two of his assessment, finding it to be a non-severe impairment. *Id.* at 19. He noted that there was no evidence of functional limitations

associated with vertigo and the medical evidence noted intact cranial nerves, normal motor strength, facial sensation, visual fields, and hearing. *Id.* Gait dysfunction was not identified by plaintiff as an alleged disability, but the ALJ nevertheless found that plaintiff could ambulate with a normal gait, no assistive device, had normal motor function, and had normal posture. *Id.* at 20, 21.

The record is replete with examples of plaintiff being observed with normal gait. *See e.g. id.* at 722 (plaintiff walked normally without assistance), 795, 799, 895, 1307, 1319, 1885, 2193, 2201. The record indicates that the plaintiff walks on an 8 to 10 inch base, but generally does not indicate any limitations her wide stance causes for functional abilities. *See e.g. id.* at 1830. On one visit, it is noted that she had "mild unsteadiness." *Id.* at 1741. Plaintiff notes one instance in the record where she reported that her "walking and balance are less precise than previously." *Id.* at 393. Plaintiff often rated her difficulty walking as a "one." *Id.* at 829.

As to vertigo, the record is similarly limited. At the Neurology Center of Fairfax, "vertigo" is listed as one of plaintiff's "active problems"; however, in almost every instance there is no mention of any limitations caused by vertigo or treatment during her visits. *See e.g. id.* at 347, 351. For example, on August 24, 2015, vertigo is listed as an active problem, but just below in "positive symptoms" the notes indicate "vertigo was 0." *Id.* There is evidence of treatment for vertigo in the record on September 30, 2013, two years before plaintiff's alleged onset date. *Id.* at 1551. She reported "severe nausea and a sense of movement without actual spinning." *Id.* She was given three days of Medrol. *Id.* at 1553. Again, before the alleged onset date in February 2015, plaintiff reported "a spinning and falling sensation." *Id.* at 377. The record does not demonstrate any further follow up or treatment for vertigo after the alleged onset date.

Plaintiff has failed to identify any basic work activities precluded by her alleged gait

dysfunction and vertigo or evidence that would qualify the disorder as a severe impairment. Nonetheless, the ALJ properly considered plaintiff's gait, vertigo, and its effects in combination with her other impairments when calculating her RFC.

### 3.    Cognitive Impairment and Mental Health

Plaintiff argues that the ALJ should have considered plaintiff's cognitive impairment severe. (Dkt. No. 16) at 6. The ALJ did find plaintiff's organic mental disorders, depression, and anxiety to be severe. Accordingly, the Court interprets this argument to challenge  the ALJ's consideration of plaintiff's cognitive functioning. Cognitive function was not identified by plaintiff as an alleged disability (separate from her MS), but the ALJ nevertheless considered and accounted for any cognitive deficits in the RFC determination. *Id*. at 19.

In assessing whether plaintiff met the paragraph B criteria, the ALJ found that plaintiff only had mild limitations in understanding, remembering, or applying information. *Id*. at 21. Testing put her in the low average range with some difficulties in working memory, but the ALJ found her memory difficulties only "minimally problematic" with goal directed thought processes and normal thought content. *Id*. She had only a mild limitation in concentration, persistence, and maintaining pace. *Id*. The ALJ found that her attention span and concentration were observed to be normal, contrary to her subjective reports of difficulties with concentration and maintaining train of thought. *Id*.

The record generally demonstrates limited objective findings as to cognitive function. Plaintiff underwent cognitive testing in August 2015, which revealed performance below expectation in simple attention span, language skills, information processing, and mood inventory. *Id*. at 945. Her verbal learning, delayed memory recall, and executive function/mental flexibility were within normal limits. *Id*. She scored a 30/30 on the mini-mental status examination, which

was within normal limits. *Id*. at 945-946. Plaintiff's mood inventory results were suggestive of moderate depression and it was recommended that she pursue mental health services and further neuropsychological testing. *Id*. at 946. There is no evidence she pursued treatment. Following examination in June 2016, Dr. VanVeelen opined that plaintiff functioned at a low-average intellectual level, but noted her general abilities were in the average range and are likely to be a better indicator of her functioning. *Id*. at 727. She had limited cognitive flexibility but scored 29/30 on a mini-mental status examination. *Id*. at 722. While her observations indicate impairments in some areas, others remain fully intact. Dr. VanVeelen diagnosed her with a mild neurocognitive disorder due to MS. *Id*. at 728. While Dr. VanVeelen suggested plaintiff could not return to the work environment (*id*. at 729), she also noted plaintiff could work on one project at a time, use a checklist, notebook, or calendar (*id*. at 730) and encouraged social endeavors (*id*. at 731). Nurse Adamson's letter to the Social Security Administration on behalf of the plaintiff repeats and incorporates Dr. VanVeelen's opinion. *Id*.  at 779.

Dr. Simsarian completed a check-the-box medical source statement in May 2017, indicating that Plaintiff's ability to understand and carry out simple, one or two-step instructions was significantly limited. *Id*. at 1968. Dr. Simsarian further opined that Plaintiff's ability to maintain attention and concentration for extended periods, handle ordinary work stress or a high stress work environment, and complete a normal workday at a consistent pace was markedly limited. *Id*. at 1968-69. Dr. Simsarian stated that plaintiff could not work an eight-hour day. *Id*. at 1969. In a checkbox form in July 2017, Dr. Bouhouch noted plaintiff's marked limitations in attention and concentration and found that she could not do even simple, unskilled work tasks. *Id*. Dr. Bouhouch noted cognitive "questions are better answered by neurology." *Id*.

At the initial stage of review Dr. McGuffin found mild cognitive impairment but gave her

"some benefit of the doubt" and concluded her mental impairments should be found to be severe. *Id.* at 82. Even when severe, an RFC limitation to simple/unskilled work sufficiently accounted for this limitation. *Id.* Dr. Nuckols, the state doctor on reconsideration, found plaintiff was not significantly limited in carrying out very short and simple instructions or detailed instructions. *Id.* at 106. She would be moderately limited in maintaining attention and concentration for an extended period of time. *Id.* Both state doctors found her non-disabled by these cognitive limitations.

Plaintiff's cognitive impairments and mental health challenges were taken into account in the RFC determination by including a limitations to performing simple one-to-four-step routines, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting, with occasional contact with coworkers, supervisors, and the public, and no fast pace or production quotas such as would be customarily found working on an assembly line. *Id.* at 22. The ALJ considered the opinions and objective evidence in the record and explained the weight given to each opinion. *See id.* at 29-30. This Court, in reviewing, may not re-weigh or make credibility determinations. Further, plaintiff's cognitive function was not alleged as a distinct disability (aside from her MS, which the ALJ found severe) and therefore the ALJ did not undertake determining whether it should be independently categorized as "severe." Even still, the ALJ considered and explained the impact of plaintiff's cognitive limitations. Because the ALJ considered conflicting evidence in the record, and made an appropriate, well explained determination, this Court should not overturn that ruling.

### 4.    Migraines

Plaintiff's final challenge to non-severe limitations argues that the ALJ should have found plaintiff's chronic migraines to be severe. The ALJ addressed plaintiff's migraines under step two

of his analysis and determined them to be a non-severe impairment. *Id.* at 19. He notes plaintiff's migraines to be conservatively and effectively treated with medication. *Id.*

The record reflects this to be the case and does not ever indicate migraines to be severe. In November 2015, it was noted that plaintiff was taking Topamax for headaches that were reduced in intensity but frequent, and Inderal for migraines. *Id.* at 654. In May 2016, January 2018, and July 2018, her migraine condition was observed to be "stable." *Id.* at 856, 2153, 2198. In Nurse Adamson's August 2016 letter to social security, she notes only "she has intermittent migraine pain, which can contribute to her cognitive problems." *Id.* at 779. The Neurology Center of Fairfax lists "common migraine" as an "active proble[m]," but notes do not indicate further treatment or limitations caused by her migraines. *See e.g. id.* at 382.

Plaintiff has failed to identify any basic work activities precluded by her migraines or evidence that would qualify the disorder as a severe impairment. The ALJ correctly identified these impairments as non-severe. While the ALJ was not obligated to consider plaintiff's non-severe impairments in the RFC determination, he did so, considering all symptoms and the extent to which they were consistent with the objective medical evidence and other evidence and could cause limitation alone or in combination. *Id.* at 22.

### ii.     Severe Impairments

The plaintiff also challenges the ALJ's consideration of her disc dysfunction and MS, which the ALJ found to be severe impairments and considered as such.

### 1.     Pain and Degenerative Disc Disease

Plaintiff argues that the ALJ should have considered plaintiff's subjective complaints of back pain. (Dkt. No. 16) at 7. She argues that the ALJ should have given greater weight to medical source statements indicating moderate or severe disc dysfunction and pain. *Id.* Plaintiff has

separated out her claims of "disc dysfunction" (taken to mean her degenerative disc disease) and her claim of pain, which plaintiff attributes to her degenerative disc disease. Because these are essentially the same claim, they are analyzed together here.

Objective evidence of pain is not required; however, objective evidence of a medical condition which could cause the alleged pain is required. *See Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996) ("Subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant."). Once a claimant "has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed," the Commissioner's evaluation of the "intensity and persistence of the claimant's pain" must "take into account not only the claimant's statements about her pain, but also 'all the available evidence,' including [1] the claimant's medical history, medical signs, and laboratory findings"; [2] any objective medical evidence of pain; and [3] any other evidence relevant to the impairment's severity, such as claimant's daily activities and medical treatment taken to alleviate symptoms. *Id*. (quoting § 404.1529(c)(2)).

The ALJ found objective evidence of plaintiff's degenerative disc disease and labeled it a severe limitation. AR at 19. However, the ALJ found that her degenerative disc disease did not lead to a debilitating effect on her functional abilities. *Id.* at 23. While her underlying impairments could reasonably be expected to cause the alleged symptoms, her statements regarding intensity, persistence, and limiting effects were not entirely consistent with the medical and other evidence in the record. *Id.* at 23. The ALJ found generally normal motor function and muscle tone, normal gait, and no evidence of limitation in standing up, or balancing. *Id.* at 21. Despite this, the ALJ determined the degenerative disc disease to be a severe limitation and accounted for it in the RFC

determination by limiting her lifting, pushing and pulling, standing or sitting periods, and postural movements. *Id.* at 22.

The record contains limited evidence of treatment for back pain. In March 2015, Dr. Simsarian noted that MRIs indicated small disc bulges, in the lumbar spine, but no evidence of nerve root compression to explain the pain. *Id.* at 1744. There is no evidence that she pursued this. He recommended she wear a back brace while she worked. *Id.* Plaintiff participated in a course of physical therapy from October 2015 through November 2015, specifically for weakness and balance difficulties. *Id.* at 312-21. The record later indicates in May 2016 that that plaintiff "adamantly" declined to return to physical therapy. *Id.* at 863. In August 2016, Nurse Adamson noted her "chronic intractable daily low back pain that makes it difficult to sit or stand for long periods of time" in her letter to the Social Security Administration. *Id.* at 802. Plaintiff was seen at the National Spine and Pain Centers for her back pain in the fall of 2016. *See id.* at 1306. She rated her pain as a 6/10, in one instance, a 7/10 in another, and an 8/10 in another. *Id.* at 1306, 1312, 1316. These are the only subjective complaints of pain in the record. While seeking treatment at the national Spine and Pain Centers, plaintiff was observed to have increased hypertonicity of the lumbar paraspinal muscles and taut bands. *Id.* at 1318. She had restricted side bending and flexion. *Id.* She had no deformity or scoliosis, normal posture and gait, and normal mood, affect, attention span, and concentration. *Id.* at 1319. She received a series of trigger point injections. *Id.* at 1306. She declined physical therapy. *Id.* at 1320. There is no further evidence of treatment sought for back pain. Entries after fall 2016 indicate no tenderness to palpitation. *See e.g. id.* at 2133, 2069.

Plaintiff has failed to identify any basic work activities precluded by her degenerative disc disease or pain. She has also failed to point to continuing subjective complaints, objective records,

or treatment related to back pain outside of a brief window in the fall of 2016. Despite this, the ALJ sufficiently analyzed the record as to this pain, classified it as a severe limitation, and properly incorporated its limitations into his RFC determination. The plaintiff asserts that classification of the degenerative disc disease and pain as "moderate," were not considered, yet the ALJ's classification of the degenerative disc disease as severe indicates otherwise.

## 2.   Multiple Sclerosis

Plaintiff argues that the ALJ should have included "context" in his discussion of new lesions and should not have "implied stability or lack of severity." (Dkt. No. 16) at 7. The plaintiff does not cite to any part of the record that demonstrates instability or severity of her MS.

Rather than implying lack of severity, the ALJ explicitly stated that plaintiff's MS was a severe impairment. *Id.* at 19. However, despite plaintiff's uncited objection, the record is replete with evidence of the stability of plaintiff's MS. An MRI in March 2015 showed stable patterns of abnormalities in the brain and spine. *Id.* at 435, 437. There was no change in the MRI from the previous year. *Id.* at 436. In September and October 2015, MRIs of the brain and spine were again "stable." *Id.* at 1135-36. In June 2016, Nurse Adamson described her MS as "clinically stable." *Id.* at 847. A June 2016 MRI again had an overall "stable appearance." *Id.* at 707, 709. An October 2016 MRI showed "very mild" progression. *Id.* at 1264. MRIs in April 2017 showed no significant change and were stable. *Id.* at 1573-74. In August 2017, Nurse Adamson reported plaintiff's MS was clinically stable, but there was disability progression. *Id.* at 2222. Nurse Adamson again noted that MS was clinically stable in November 2017. *Id.* at 2210. March and May 2018 MRIs were, again, stable. *Id.* at 2171, 2171. Nurse Adamson reported her MS was clinically stable again in July 2018. *Id.* at 2160.

The ALJ clearly took into account that the plaintiff had symptoms of MS, however those

symptoms, based on the evidence in the record, were non-disabling and stable. *Id.* at 23. The ALJ crafted an RFC that took into account the symptoms of plaintiff's MS, including her back pain, cognitive difficulties, and more.

### B.     Insufficient Explanations Concerning Medical Source Statements

Plaintiff next argues that the weight given to certain medical source statements was not sufficiently explained, including the assessment of Dr. VanVeelen and Nurse Adamson. (Dkt. No. 16) at 8-9.

Again, it is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c). This Court, in reviewing, may not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589; *see also King*, 599 F.2d at 599 (providing that it is not the role of the court to try the case de novo when reviewing disability determinations). The "ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies, or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267.

In evaluating the opinion of a treating source, the ALJ is to consider whether the source examined the patient, the treatment relationship, whether there is evidence to support the opinion, whether it is consistent with the record, and whether the source has a specialty in this area. 20 C.F.R. § 404.1527(c). Specifically, a treating physician's opinion can receive controlling weight if it is well-supported by the evidence and not inconsistent with substantial evidence in the case. 20 C.F.R. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858 (4th Cir. 2017). The ALJ must provide "good reasons" supported by evidence as to why the treating physician was not given controlling weight. 20 C.F.R. § 404.1527 (c)(2).

40

As to the explanation of the weight given to a medical source, Social Security Ruling 96-8p requires the RFC to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Macio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing SSR 96-8p).

### i.    Dr. VanVeelen

Plaintiff argues that the ALJ did not give sufficient weight to Dr. VanVeelen's medical source statement (AR at 1286-1300), and "dismissed" her opinion with "insufficient explanation." (Dkt. No. 16) at 8.

Dr. VanVeelen is a neuropsychologist that plaintiff was referred to for a neuropsychological evaluation in July 2016. *Id.* at 1286. According to the record, plaintiff only saw her once, and she was, therefore, not a treating physician. Only a medical opinion from a treating source can be given controlling weight.  20 C.F.R. § 404.1527 (c)(2). When a non-treating physician provides an opinion inconsistent with the record, the ALJ is entitled to afford it little or no weight. § 404.1527 (c)(3)-(4).

Dr. VanVeelen opined that plaintiff functioned at a low-average intellectual level, but noted her general abilities were in the average range and are likely to be a better indicator of her functioning. *Id.* at 727. While her observations indicate impairments in some areas, others remain fully intact. Dr. VanVeelen diagnosed her with a mild neurocognitive disorder due to MS. *Id.* at 728.

Rather than "dismissing" Dr. VanVeelen's report, the ALJ afforded it partial weight, which was within his authority. He described Dr. VanVeelen's findings that plaintiff could not return to work, but found them inconsistent with her objective examination, where plaintiff scored a 29/30

on the mini-mental status examination. *Id*. at 29. The ALJ also highlighted that disability is a legal determination reserved for the ALJ and he was not obligated to adopt her opinion. *Id*. The ALJ did incorporate some of Dr. VanVeelen's findings and limited the plaintiff's RFC to simple tasks, with only occasional decision making, occasional changes, occasional interaction with co-workers, supervisors and with the public, and no fast pace or production quotas. *Id*. at 22.

The ALJ could not give Dr. VanVeelen controlling weight and had the authority to assess the other evidence and determine the weight to be afforded to a consulting source's opinion. This court may not re-weigh that determination. The undersigned finds that the ALJ articulated a narrative discussion and cited specific facts in determining what weight to afford Dr. VanVeelen.

### ii.     Nurse Adamson

Plaintiff argues that the ALJ did not give sufficient weight to the medical source statement from Nurse Adamson, the nurse practitioner that plaintiff saw at Neurological Centers of Fairfax. (Dkt. No. 16) at 8. Plaintiff argues that Nurse Adamson's opinion was consistent with every other provider as to her mental and cognitive health impairments and seeks greater explanation for the low weight afforded it. *Id.*

Only a medical opinion from a treating source can be given controlling weight. 20 C.F.R. § 404.1527 (c)(2). Medical sources are licensed physicians or licensed psychologists, but an ALJ may consider evidence from other non-medical sources, such as nurse practitioners. 404.1513(a); *see e.g. Hunter v. Berryhill,* No. 3:17-CV-112, 2018 WL 310138, at *8 (E.D. Va. Jan. 5, 2018).

The ALJ gave the opinion statement of Nurse Adamson little weight. Plaintiff refers specifically to the medical source statement of Nurse Adamson, which is taken to refer to the letter to the Social Security Administration she wrote for plaintiff's disability claim. AR at 779. Plaintiff argues the letter is consistent with the other evidence of the record with regard to mental and

cognitive impairments only. (Dkt No. 16) at 8. However, Nurse Adamson makes no findings as to her mental and cognitive impairments; rather, she simply incorporates the evaluation of Dr. VanVeelen. AR at 779. Nurse Adamson includes none of her own observations as to plaintiff's mental or cognitive state. *Id.* Further, Nurse Adamson's letter consists primarily of conclusions about her ability to work; however, disability is a legal determination reserved for the ALJ, and he was not obligated to adopt her opinion. *Id.*

The ALJ found Nurse Adamson's opinion letter to be inconsistent with her own psychiatric and physical findings and those of others, such as Dr. Bouhouch, plaintiff's physician who consistently described her mood, speech, thought processes, content, judgment, insight, and cognition, as normal. *Id.* at 30. Even so, as discussed above, if plaintiff seeks to use Nurse Adamson's letter as a vehicle to argue the ALJ should have given greater weight to Dr. VanVeelen's findings, the ALJ properly accounted for those findings with his limitation of the plaintiff's RFC to simple tasks, with only occasional decision making, occasional changes, occasional interaction with co-workers, supervisors and with the public, and no fast pace or production quotas. *Id.* at 22.

The ALJ could not give Nurse Adamson controlling weight and had the authority to assess the other evidence and determine the weight to be afforded to a non-physician's opinion. This court may not re-weigh that determination. The undersigned finds that the ALJ provided a sufficient narrative assessment of the facts and explained the lesser weight given to Nurse Adamson's medical source statement.

## V.    Recommendation

For the reasons set forth above, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 15) be DENIED, defendant's Motion for

Summary Judgment (Dkt. No. 18) be GRANTED, and the ALJ's decision be AFFIRMED.

**VI.    Notice**

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge

September 9, 2021
Alexandria, Virginia